UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
L.G.M.,

                      Petitioner,

        - against -

ANTHONY J. LAROCCO, *in his official capacity as Sheriff of the Nassau County Correctional Center*; WILLIAM P. JOYCE, *in his official capacity as Acting Field Office Director, New York City Field Office, U.S. Immigration & Customs Enforcement*; KRISTI NOEM, *in her official capacity as Secretary, U.S. Department of Homeland Security*; and PAMELA BONDI, *in her official capacity as Attorney General, U.S. Department of Justice,*

                      Respondents.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-2631 (PKC)

PAMELA K. CHEN, United States District Judge:

On May 9, 2025, Petitioner L.G.M. ("Petitioner" or "L.G.M.") filed a Petition for Writ of *Habeas Corpus* ("Petition") pursuant to 28 U.S.C. § 2241, in which he requested immediate release from Immigration and Customs Enforcement ("ICE") custody or, in the alternative, a bond hearing. (Pet., Dkt. 1.) Named as Respondents are Anthony J. LaRocco ("LaRocco"),[1] William P. Joyce ("Joyce"), Kristi Noem ("Noem"), and Pamela Bondi ("Bondi"), all in their respective official capacities (Joyce, Noem, and Bondi, together, "Government Respondents"). (*Id.*) On June 25, 2025, the Court granted L.G.M. a bond hearing in front of this Court. (Bond Hr'g Mem. & Order ("M&O"), Dkt. 30.) On July 9, 2025, the Court held the bond hearing, which L.G.M. attended in person as facilitated by ICE, and during which the Court received testimony and

---

[1] LaRocco has not yet made an appearance in this matter.

evidence from the parties. (7/9/2025 Min. Entry.) The Court deferred ruling on L.G.M.'s release at the hearing. (*Id.*) The Court now grants L.G.M.'s release, subject to bond conditions to be determined with input from L.G.M. and Government Respondents.

## BACKGROUND

Given the extensive briefing by the parties and the summary included in the Court's previous decision, (Bond Hr'g M&O, Dkt. 30, at 2–4), the Court summarizes only the facts most relevant to the issue of bond. The underlying facts are not disputed.

### I. L.G.M.'s Arrival in the United States

L.G.M. was born in El Salvador and began to show developmental delays early in life. (Hesser Decl., Dkt. 3-2, at 1.) His mother relocated for work, and so he was raised primarily by his grandparents. (*Id.*) During his childhood in El Salvador, L.G.M. and his family faced threats and significant violence from the notorious gang MS-13, which sought to recruit L.G.M. (*Id.* at 1–2.) Eventually, due to these threats, L.G.M.'s mother decided that he would come to the United States; he entered the United States as an undocumented minor in 2016 at age 13 and reunited with his mother in Long Island. (*Id.* at 2.) He applied for and was granted Special Immigrant Juvenile Status and deferred action in conjunction with that status in October 2019, and he has had a pending asylum application since September 2017. (*Id.* at 3.)

### II. L.G.M.'s Criminal History

After arriving in the United States, L.G.M. was eventually recruited by the 18th Street Gang, or Barrio 18 (the "Gang"), which is an MS-13 rival. (*Id.* at 2.) L.G.M.'s affiliation with the Gang led to several arrests and convictions in New York State court, for disorderly conduct, attempted assault in the second degree, and attempted robbery. (*Id.* at 2; Gov't Bond Ex. 1, Dkt. 38-1, at 17–18.) Based on these convictions, L.G.M. was sentenced to two one-year sentences

and one 15-day sentence, to run concurrently. (Hesser Decl., Dkt. 3-2, at 2.) He served his sentence and was released on August 16, 2024. (*Id.* at 2–3.)

### III.    L.G.M.'s Removal History

Immediately upon his release from state custody, L.G.M. was transferred into ICE custody and detained pursuant to 8 U.S.C. § 1226(c). (*Id.* at 3.) L.G.M.'s counsel in his removal proceedings noticed L.G.M.'s limited verbal communication skills and ordered a psychological evaluation, which was completed on October 21, 2024, by psychologist Dr. Macarena Corral. (*Id.*) L.G.M.'s individual hearing was scheduled to begin on November 19, 2024, but the Immigration Judge ("IJ") assigned to L.G.M.'s removal proceedings adjourned the proceedings due to L.G.M.'s demonstrated verbal communication issues. (*Id.*) A competency evaluation was completed on November 26, 2024. (*Id.*) After a competency hearing in January 2025, the IJ agreed with Dr. Corral's assessment that L.G.M. was not competent to stand trial under normal procedures, but that L.G.M. could do so with various safeguards. (*Id.*) In April 2025, after conducting an individual hearing with agreed-upon safeguards, the IJ granted L.G.M. deferral of removal under the Convention Against Torture ("CAT"). (*Id.*) This deferral was premised on the IJ's finding that L.G.M. faced significant risk of torture if returned to El Salvador "due to his criminal record, tattoos, age, socioeconomic status, and status as a deportee from the United States." (IJ Decision, Dkt. 14-1, at ECF[2] 24–25.) On April 24, 2025, the Department of Homeland Security filed an appeal of the deferral order with the Board of Immigration Appeals. (Hesser Decl., Dkt. 3-2, at 3.) The appeal is pending, (*see* Bond Hr'g Tr., Dkt. 42, at 66:2), and L.G.M. remains in ICE custody.

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

3

## IV.    Procedural History before this Court

L.G.M.'s counsel filed this Petition on May 9, 2025.  (Pet., Dkt. 1.)  At that time, L.G.M. was being held at the Nassau County Correctional Center ("Nassau") in East Meadow, New York, where he was transferred on May 8, 2025, from the Orange County Jail in Goshen, New York, where he had been detained for the previous nine months.  (*Id.* at 1, n.2.)  At some point prior to filing the Petition, L.G.M.'s counsel was notified that ICE intended to transfer L.G.M. "tomorrow," i.e., May 10, 2025, from Nassau to a facility in Louisiana.  (*Id.* at n.2.)  Despite the filing of L.G.M.'s Petition in this district, ICE transferred L.G.M. to Louisiana on May 10, 2025.  (Dkt. 10, at 1.)  After a hearing before this Court on May 13, 2025, (5/13/2025 Min. Entry), Government Respondents transferred L.G.M. to a facility near Buffalo, New York, (Dkt. 15).  Following briefing by both parties, the Court granted L.G.M.'s request for relief in the form of a bond hearing in front of this Court.  (Bond Hr'g M&O, Dkt. 30.)  The Court held that hearing (the "Bond Hearing") on July 9, 2025, during which it heard testimony from Dr. Corral via video and L.G.M. in person, as well as received documentary evidence from both parties.[3]

---

[3] In its Bond Hearing M&O, the Court invited L.G.M.'s counsel to submit a request for hearing accommodations for L.G.M. in light of his mental deficits and the safeguards implemented in prior hearings in front of the IJ. (Bond Hr'g M&O, Dkt. 30.) On July 1, 2025, L.G.M.'s counsel submitted this request, (Dkt. 32), which the Court granted in part, (7/2/2025 Dkt. Order). Namely, the Court granted counsel's request that Government Respondents submit their written questions for L.G.M. before the Bond Hearing, but denied the request that L.G.M. provide only written, rather than oral, testimony. (*Id.*) During the Bond Hearing, the Court required L.G.M. to testify but limited the scope of questioning to L.G.M.'s affiliation with the Gang. (Bond Hr'g Tr., Dkt. 42, at 13:25–14:7.)

## LEGAL STANDARD[4]

The Fifth Amendment entitles noncitizens to due process in removal proceedings. *Black v. Decker*, 103 F.4th 133, 143 (2d. Cir. 2024) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)).[5] "The Constitution establishes due process rights for 'all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'" *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Courts in this Circuit determine what due process is due to noncitizens in removal proceedings and related custody based on an evaluation of the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which include: (1) the individual's private interests; (2) the risk of an erroneous deprivation of the individual's liberty; and (3) the government's interest. *Id.* at 147, 151 (citing *Mathews*, 424 U.S. at 335).

Where a noncitizen's detention has been unconstitutionally prolonged in violation of their due process rights, the noncitizen is entitled to a bond hearing, during which the government bears the burden of showing by "clear and convincing evidence" "the need for [the noncitizen's] continued detention." *Black*, 103 F.4th at 155, 157–58. Because removal proceedings are civil rather than criminal, any need for detention cannot be punitive in nature and must instead serve "two regulatory goals: ensuring the appearance of aliens at future immigration proceedings and [p]reventing danger to the community." *Zadvydas*, 533 U.S. at 690 (internal quotations and citation omitted). Therefore, the government must show by clear and convincing evidence that the

---

[4] Although the Court suggested that it was going to consider L.G.M.'s bond under the standard set forth in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), (*see* Bond Hr'g M&O, Dkt. 30, at 10), that would be incorrect, as the parties recognize, because *Mapp* governs bond *pending* a *separate* habeas petition, and here the Court has already granted L.G.M.'s Petition by ordering a bond hearing. The Court therefore agrees with the parties that an analysis under *Mapp* is no longer required at this stage. (Bond Hr'g Tr., Dkt. 42, at 48:2–50:7.)

[5] Throughout this matter, Government Respondents have repeatedly objected to *Black*, as to which they have sought *en banc* review. (*See, e.g.*, Bond Hr'g Tr., Dkt. 42, at 57:19–22.)

petitioner "poses a risk of flight or a danger to the community" such that continued detention is necessary. *Black*, 103 F.4th at 155 (quoting *Black v. Decker*, No. 20-CV-3055 (LGS), 2020 WL 4260994, at *9 (S.D.N.Y. July 23, 2020)).

## DISCUSSION

### I. The *Mathews* Factors and Consideration of Mitigating Measures

The parties agree that the underlying facts of L.G.M.'s detention, including its duration, warrant a bond hearing under *Black*, (*see* Gov't Ltr., Dkt. 12, at 2 (acknowledging "that the facts and law set forth in *Black* would likely lead this Court to order that Petitioner receive a bond hearing before an IJ")), and that Government Respondents carry the burden of showing, by clear and convincing evidence, that L.G.M.'s detention must continue because he is either a danger to the community or a flight risk, (Bond Hr'g Tr., Dkt. 42, at 57:4–5). *See Black*, 103 F.4th at 155–56 (noting that "*Mathews* factors again serve as . . . guide" for bond hearing procedures).[6] As the Court advised the parties at the Bond Hearing, the Court is taking into consideration measures that can mitigate any risk of danger or flight that L.G.M. poses in determining *whether* he poses a risk of danger or flight. *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71 (1992) (finding, in context of involuntary commitment to psychiatric hospital following not-guilty-by-reason-of-insanity acquittal, the government is required to establish, by clear and convincing evidence, insanity and dangerousness permitting confinement); *United States v. Salerno*, 481 U.S. 739, 750–51 (1987) (finding, in context of pretrial detention, that the government is required "[i]n a full-blown adversary hearing . . . to convince a neutral decisionmaker by clear and convincing evidence that

---

[6] The *Black* court thoroughly analyzed the unique challenges faced by individuals detained in immigration matters pursuant to 8 U.S.C. § 1226(c). *Black*, 103 F.4th at 156. These include difficulty in securing counsel, as noncitizens in removal proceedings are not entitled to counsel and can be "transfer[ed] to any ICE detention center, even one not located in the district of the alleged offense" and "far from any community support," *id.*—as has occurred in this matter.

6

no conditions of release can reasonably assure the safety of the community or any person", i.e., "that [the] arrestee presents an identified and articulable threat to an individual or the community"). Other courts in this Circuit have applied the same standard. *See, e.g.*, *Cantor v. Freden*, 761 F. Supp. 3d 630, 637 (W.D.N.Y. 2025) ("[F]ailing to consider whether alternatives to detention may ameliorate any danger posed by [petitioner's] release creates a significant risk that he will be erroneously deprived of his liberty interest."); *J.C.G. v. Genalo*, No. 24-CV-8755 (JLR), 2025 WL 88831, at *11 (S.D.N.Y. Jan. 14, 2025) (requiring the IJ to hold a bond hearing where the IJ must "consider the availability of alternative conditions of release" when "determining whether to grant bond"); *Bonilla v. Decker*, No. 22-CV-4501 (ER), 2024 WL 182315, at *6 (S.D.N.Y. Jan. 17, 2024) (upholding the IJ's assessment that "no bond or alternatives to detention could ameliorate the danger of recidivist drunk driving or gang activity").

Citing *Black*, Government Respondents argue that mitigating measures should be considered only if and once the Court has determined that L.G.M. poses no danger to the community, rather than as part of the dangerousness evaluation itself.[7] (Bond Hr'g Tr., Dkt. 42, at 5:5–24; Gov't Opp. to Bond Hr'g, Dkt. 27, at 6 ("Significantly, 'a bond amount would be at issue only once the IJ has determined the noncitizen does not pose a danger to the community.'" (quoting *Black*, 103 F.4th at 158)).) *Black* later states that "a showing of dangerousness by clear and convincing evidence would foreclose any possibility of bond." 103 F.4th at 159.

The Court disagrees with Government Respondents' reading of *Black*. The discussion Government Respondents cite to in *Black* is focused on the process for setting the *amount* of bond

---

[7] As previously noted, Government Respondents disagree with *Black* and are seeking *en banc* review of that decision. However, if *Black* is reversed, it is unclear what support Government Respondents will have for their argument that mitigating measures may only be considered if and after no dangerousness is found.

and not the *availability* of bond. That is, setting a bond amount does not come into play unless and until the Court finds that the petitioner does not present a risk of danger to the community. That holding does not say anything about what the Court may consider in determining *whether* the petitioner poses such a risk. Similarly, *Black*'s subsequent language that a "showing of dangerousness" precludes a bond says nothing about what the Court may consider in determining whether dangerousness has been *shown* as a threshold matter. Indeed, it appears that in *Black*, the government argued—and the *Black* panel "agree[d]"—that IJs enjoy "broad discretion . . . in determining a noncitizen's *eligibility* for release on bond," and that "[a]n IJ . . . may consider financial circumstances and alternatives to detention" in making that determination. *Id.* (emphasis added). "[T]he private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Id.* at 151 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). The government's "legitimate interests" include "protecting the community" and "ensuring the noncitizen's appearance at proceedings." *Id.* at 153. "[A]ny detention incidental to such interests must 'bear a reasonable relation to' those interests," *id.* at 158 (quoting *Zadvydas*, 533 U.S. at 690) (cleaned up), and depriving a detained individual of their liberty interest would be "erroneous[]" if there were any available alternatives to that deprivation that would ensure the community is protected and the noncitizen appears at subsequent proceedings, *id.* (citing *Mathews*, 424 U.S. at 335)). Thus, the Court does not find that *Black* precludes the Court's consideration of mitigating measures in determining whether Government Respondents have shown by clear and convincing evidence that Petitioner poses a risk of danger to the community.[8]

---

[8] As suggested by *Black*, the Court is guided by the pre-trial release standards that apply in criminal matters. *See Black*, 103 F.4th at 158 (finding "no reason . . . to deviate from [the] approach" used in, *inter alia*, *Salerno*, 481 U.S. at 751, which required a finding of dangerousness

8

Accordingly, the Court considers the availability of ameliorative measures in determining whether Government Respondents have demonstrated, by clear and convincing evidence, that Petitioner poses a risk of flight or danger to the community if he is released from detention pending the resolution of his removal proceedings.

## II.     Dangerousness

After careful consideration of the facts in the record, the Court finds that bond can be granted to L.G.M. with conditions that would sufficiently ameliorate any danger he presents to the community.

### A.     L.G.M.'s Record

The Court conducts an independent review of the evidence that is part of L.G.M.'s record. *See Ozturk v. Trump*, No. 25-CV-0374 (WKS), --- F. Supp.3d ---, 2025 WL 1420540, at *9 (D. Vt. May 16, 2025) (explaining that an Article III court "is obligated to conduct an independent and rigorous review of the evidence that is a part of the record"); *Mahdawi*, 2025 WL 1243135, at *3, *12 (considering past allegations, lack of criminal record, and letters from community members in evaluating whether petitioner "presents [a] danger to his community or to others"). Government Respondents rely on L.G.M.'s criminal history and disciplinary record while in ICE detention to show dangerousness. (Gov't Opp. to Bond Hr'g, Dkt. 27, at 9–10.)  For the reasons explained below, the Court, however, does not find that Petitioner's past convictions or conduct while in custody establish, by clear and convincing evidence, that L.G.M. poses a risk of harm to the community if released from detention with restrictive conditions.

---

that "no conditions of release can dispel" for pre-conviction detention of a criminal defendant, and *Foucha*, 504 U.S. 71, which applied the same standard in the context of involuntary commitment to a psychiatric hospital); 18 U.S.C. § 3142; *see also Zadvydas*, 533 U.S. at 690 (noting that the pre-trial release analysis that is appropriate for adjudicated criminals could hardly be faulty in the immigration detention context, which is essentially a civil action).

9

1. L.G.M.'s Prior Convictions and Gang Affiliation

The Court summarizes L.G.M.'s criminal record based on the evidence produced by the parties and presented at the Bond Hearing. After arriving in the United States at the age of 13, L.G.M. began affiliating himself with the Gang, perhaps motivated by a desire to make friends, to get protection, or something else. (Hesser Decl., Dkt. 3-2, at 2 (describing L.G.M.'s recruitment into the Gang); Bond Hr'g Tr., Dkt. 42, at 51:22–52:12 (describing the bullying L.G.M. was subjected to once in the United States and how this led to him seek friendship and protection from individuals who were part of the Gang).) By the time of L.G.M.'s first arrest at the age of 18, L.G.M. was a member of the Gang. (*Id.* at 52:13–15.) Between December 2021 and March 2023, L.G.M. was arrested three times as a result of his involvement with the Gang. (Pujol Decl., Dkt. 14-1, ¶¶ 13, 15, 16; *see also* Bond Hr'g Tr., Dkt. 42, at 52:19–21.) These arrests led to convictions for: (1) disorderly conduct on May 9, 2022; (2) robbery in the second degree (although adjudicated as a juvenile) on January 20, 2023; and (3) attempted assault with intent to cause physical injury with a weapon, attempted robbery in the third degree, and disorderly conduct on September 29, 2023. (Pujol Decl., Dkt. 14-1, ¶¶ 14, 15, 17; Gov't Bond Ex. 1, Dkt. 38-1, at ECF 17.) Although one of the incidents underlying the convictions involved guns, there is no evidence in the record that L.G.M. possessed or fired a gun. (*See* Bond Hr'g Tr., Dkt. 42, at 58:19–23.) L.G.M. did use a knife against another individual in the attempted assault and attempted robbery incident, but it is unclear whether this was in self-defense. (*Compare* Gov't Bond Ex. 1, Dkt. 38-1, at ECF 35 (police report detailing victim statement) *with* October 2024 Corral Report, Dkt. 39-8, at 6 (describing the altercation as "self-defense" after L.G.M. "was in a physical argument, and . . . defended himself, grabbed the man's knife, and cut him").)[9] Indeed, the

---

[9] Indeed, Government Respondents' description of L.G.M.'s criminal history as "a bit of a run" complete with "a charge of attempted murder" was misleading, given that he was never

10

criminal records on which Government Respondents rely to argue dangerousness contain only arrest notes and court paperwork, which do not provide a complete picture of the underlying facts relating to any of his convictions.

Although L.G.M.'s prior convictions are not trivial, without any information regarding L.G.M.'s specific conduct during the crimes, these do not go far in demonstrating that L.G.M. is dangerous. Furthermore, the fact that L.G.M. served only a year in total for all of his convictions further undercuts the seriousness of his conduct.[10] (Gov't Bond Ex. 1, Dkt. 38-1, at ECF 17; Hesser Decl., Dkt. 3-2, at 2.)

Government Respondents also rely on L.G.M.'s affiliation with the Gang more generally to show dangerousness. Government Respondents dispute L.G.M.'s claim that he has renounced his affiliation with the Gang, which he made in connection with his bond request, and argue that L.G.M. will return to the Gang if released. (*See* Bond Hr'g Tr., Dkt. 42, at 59:21–60:5.) In support, Government Respondents point to L.G.M.'s testimony during the February 2025 removal proceedings before the IJ in which L.G.M. confirmed that he was still part of the Gang. (*See id.* at 12:20–23 (reading from IJ proceeding transcript L.G.M.'s testimony regarding being a member of the Gang), 45:21–22 (L.G.M. testifying that he told the IJ in February 2025 that he was a member of the Gang).)[11] Government Respondents argue that the "inconsistency" between L.G.M.'s two sworn statements shows that L.G.M. is testifying to whatever serves his purpose at

---

convicted of attempted murder. (Bond Hr'g Tr., Dkt. 42, at 58:13–18; *see* Gov't Bond Ex., Dkt. 38-1, at ECF 17.)

[10] The Court notes that L.G.M.'s sentence included multiple one-year sentences to run concurrently.

[11] The Court has reviewed L.G.M.'s testimony in front of the IJ, which was submitted as an exhibit during the Bond Hearing. (Bond Hr'g Tr., Dkt. 42, at 10:2–12 (discussing transcript of IJ proceedings).)

the moment—i.e., getting deferred removal in the IJ proceeding versus getting bond in this proceeding. (*Id.* at 59:21–22.) As part of this argument, Government Respondents essentially contend that, if released, L.G.M. will have to maintain his membership in the Gang, because without it, he will lose his CAT claim that led to him being granted deferred removal. (*See id.* at 61:15–24.)

However, the Court does not find inconsistent, and credits, L.G.M.'s testimony at the Bond Hearing that while he still considered himself a member of the Gang when he testified at the hearing before the IJ in February 2025, he no longer does and that he does not intend to rejoin the Gang if released.[12] (*Id.* at 42:13–18, 43:4–10.) It is neither implausible nor incredible that, in February 2025, L.G.M. believed that he was still a member of the Gang—and, as importantly, that the outside world perceived him as such[13]—yet, during the intervening four months, decided to renounce that membership, especially at a time when he was not under pressure from the Gang to associate with them. The operative question for this Court is the status of L.G.M.'s Gang affiliation *today* and whether he intends to associate with the Gang if released from custody. The Court does

---

[12] As discussed *supra*, in assessing L.G.M.'s credibility and testimony, the Court takes into consideration L.G.M.'s significant mental deficits, which are thoroughly documented in Dr. Corral's reports. (*See generally* October 2024 Corral Report, Dkt. 39-8.) Relatedly, because of L.G.M.'s mental deficits, the Court does not find that he is capable of the cunning necessary to, as Government Respondents argue, (Bond Hr'g Tr., Dkt. 42, at 70:15–23), calculate what would best serve his interests with respect to his testimony at the removal proceeding versus the Bond Hearing in this case.

[13] L.G.M.'s counsel argues, and L.G.M.'s July testimony corroborates, that, at the IJ hearing, L.G.M. was trying to communicate that he faced a significant risk of gang-related of torture if removed to El Salvador. (*See* Bond Hr'g Tr., Dkt. 42, at 43:11–16, 55:13–56:2.) Indeed, the IJ granted deferral of removal based on the risk of torture without distinguishing between whether L.G.M. was still a member of the Gang or not. (*See generally*, IJ Decision, Dkt. 14-1 (describing this risk as stemming from L.G.M.'s tattoos and socio-economic status as well as the gang information-sharing between the U.S. and Salvadorean governments, whose identification of L.G.M. as having been a Gang member at some point in time would be sufficient to trigger his arrest and torture under the current state of exception in El Salvador).)

not find that the evidence establishes either and finds that any risk of L.G.M. associating with the Gang upon release can be lessened by restrictions placed on his release.

### 2. L.G.M.'s Custodial Disciplinary Record

Turning to L.G.M.'s disciplinary record during his ICE detention, which Government Respondents also rely on to show dangerousness, the Court similarly does not find this evidence sufficient to meet the clear and convincing standard, even when considered in conjunction with L.G.M.'s criminal history. According to the records produced by Government Respondents, L.G.M. was cited for a number of disciplinary code violations and behavioral issues during his ICE detention. (Gov.'t Bond Ex. 3, Dkt. 38-3, at ECF 2, 9, 11, 19, 36 (prison hearing reports detailing excessive noise/disorderly conduct, possession of facility contraband (modified pens), possession of any item used as a weapon, conduct that disrupts or interferes with facility, defacing county property, disobeying correction officer, and fighting).) In particular, L.G.M. participated in at least one fight while detained. (*Id.* at ECF 38.) Government Respondents proffer this to suggest that L.G.M.'s criminal and purportedly violent behavior and his Gang affiliation are current. (*See* Bond Hr'g Tr., Dkt. 42, at 62:11–13.) But, without a fuller record as to the circumstances surrounding each of these incidents, the Court cannot find that this disciplinary record is proof of L.G.M.'s dangerousness as opposed to proof of the dangerousness of prison. (*See* G-M Aff., Dkt. 39-1, at ECF 8 ("Even when [L.G.M.] was incarcerated, they beat him up a lot in the jail and one time so badly that they had to take him to Nassau hospital.").) Additionally, as the Court confirmed at the Bond Hearing, Government Respondents have failed to prove that L.G.M.'s infractions were gang-related. (Bond Hr'g Tr., Dkt. 42, at 62:25–63:3 (THE COURT: "So [you] don't know and you don't have any evidence that it was gang related, right?" MR. KNAPP: "His friend -- I don't have -- I can't say definitively that it was gang related.").) The Court therefore does not find that L.G.M.'s disciplinary record while in ICE detention shows that

13

he presents a danger to the community if released, especially given his disassociation from the Gang and the conditions that will be placed on his release, *see infra*.

### 3. L.G.M.'s Mental Capacity

The Court also considers the risk posed by L.G.M.'s mental health issues and deficits. Government Respondents contend that mental illness may be a reason to continue detaining an individual. (Bond Hr'g Tr., Dkt. 42, at 68:17–69:14 (citing *Black*, 103 F.4th at 143 (itself citing *Zadvydas*, 533 U.S. at 691)).) While that might be true where a person's mental illness leads them to engage in violence or other anti-social behavior, that is not the situation here.

Although the evidence indicates that L.G.M. might be suggestible due to his diminished mental capacity[14] and that he is currently suffering from depression and anxiety, the Court does not find that these conditions make him more dangerous or weigh in favor of incarceration. As the Court stated at the Bond Hearing, despite L.G.M. suffering from "all sorts of mental health issues," including "anxiety and depression [that] are being exacerbated by his continued incarceration," "[n]o one has made a connection between that behavior and violence perpetrated by him [or] that led to his arrest." (Bond Hr'g Tr., Dkt. 42, at 69:16–21.) Indeed, Dr. Corral[15] found L.G.M.'s anger to be "situationally determined and transient." (June 2025 Corral Report, Dkt. 39-10, at 5.) Ultimately, the Court does not believe these concerns—especially the possibility that L.G.M. will be pressured or convinced to re-associate with Gang members—cannot be

---

[14] In particular, the Court recognizes that this diminished capacity appears to have played a significant role in L.G.M. joining the Gang in the first place. (*See, e.g.*, G-M Aff., Dkt. 39-1, at ECF 8–9 (discussing how L.G.M.'s "trouble understanding things" made him a target for bullying and increased the value of the protection the Gang could provide).)

[15] At the Bond Hearing, Government Respondents accepted Dr. Corral's credentials and qualifications as an expert, (Bond Hr'g Tr., Dkt. 42, at 25:18–19), and the IJ previously found her testimony "credible and persuasive," (IJ Decision, Dkt. 14-1, at ECF 20).

mitigated by conditions of bail and does not believe they rise to a level that requires L.G.M.'s ongoing and potentially indefinite detention[16]—detention that has demonstrably aggravated L.G.M.'s mental health issues. (*See* June 2025 Report, Dkt. 39-10, at 4.) Rather, if released, L.G.M.'s mental health and behavioral issues could and should be addressed by professionals like those identified by L.G.M.'s counsel.[17]

### B. Release Conditions That Would Mitigate any Dangerousness Posed by L.G.M.

Subject to input from the parties, the Court finds that the below bond conditions would mitigate any risk of danger posed by L.G.M. and should therefore be imposed in some form, if feasible.

The first and most important bond condition is to limit L.G.M.'s ability to leave his family home. L.G.M.'s past crimes were all perpetrated with other individuals, i.e., members of the Gang. (*See* Gov't Bond Ex. 1, Dkt. 38-1, at ECF 32–33.) Therefore, restricting or curtailing L.G.M.'s ability to interact with non-family members, in particular Gang members, should significantly lessen the risk of L.G.M. being involved in violence or other illegal activity. The Court relies on Government Respondents to advise on how to effectuate and monitor such restrictions, including the viability of an ankle monitor. The Court also invites L.G.M.'s counsel to advise whether and how L.G.M.'s family might be able to facilitate or ensure L.G.M.'s adherence to any such restrictions.

---

[16] The parties do not appear to dispute that, even if Government Respondents' appeal of the IJ's deferred removal decision is successful, L.G.M.'s immigration proceedings could last years. (*See* Bond Hr'g Tr. at 56, 74.)

[17] L.G.M.'s counsel provides information from two such professionals, a social worker with the Bronx Defenders and the Executive Director of S.T.R.O.N.G. Youth, Inc., a gang-prevention, intervention, and reentry non-profit, who have indicated their readiness to provide support to L.G.M. if he is released. (Dkts. 39-2, 39-3.)

The second bond condition involves treatment for L.G.M.'s mental health issues and participation in pro-social programs, such as those recommend by L.G.M.'s counsel. (*See* Release Plan, Dkt. 39-2, at 2; S.T.R.O.N.G. Ltr., Dkt. 39-3.) Both will significantly help to reduce the risk of recidivism by L.G.M. and to increase the likelihood of L.G.M.'s success on pre-adjudication release. The Court also invites Government Respondents to provide their views on the propriety, efficacy, and/or sufficiency of the treatment and programming proposed by L.G.M.'s counsel. Both parties should also address the issue of how to effectuate these measures within the framework of home confinement.

Finally, the third bond condition is for L.G.M. to resume working in construction with his stepfather, as suggested by L.G.M.'s family. (M-G Aff., Dkt. 39-1, at ECF 2; A-P Aff., Dkt. 39-1, at ECF 12.) Steady employment will provide financial support and stability for L.G.M. and thereby facilitate L.G.M.'s re-entry into society after his prolonged detention. The advantage of the current proposal is that L.G.M. will be supervised and monitored by a family member. The Court therefore invites submissions from both parties regarding the feasibility of L.G.M.'s return to this construction job, given the anticipated restrictions on L.G.M.'s ability to leave his home and the need to minimize the risk of L.G.M. being approached by, or re-affiliating with, the Gang.

\* \* \*

In sum, the Court finds that Government Respondents have failed to demonstrate by clear and convincing evidence that, if released, L.G.M. presents a risk of danger to the community that cannot be sufficiently ameliorated through restrictive release conditions. *See Bonilla*, 2024 WL 182315, at \*6 (affirming IJ's assessment that "no bond or alternatives to detention could ameliorate the danger of recidivist drunk driving or gang activity"). To hold otherwise, without any evidence of L.G.M.'s actual conduct or the circumstances surrounding L.G.M.'s prior

16

convictions and disciplinary infractions, would amount to improper speculation. *Compare Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240–41 (W.D.N.Y. 2019) (finding "mere speculation" based on past convictions inadequate to draw conclusions with the certainty required to meet the "clear and convincing" standard) *with Bonilla*, 2024 WL 182315, at *3 (upholding IJ finding of ongoing dangerousness of convicted drunk driver because of "recidivist drunk driving" and "credible allegations of [ongoing] gang affiliation" (citation omitted)); *see Zadvydas*, 533 U.S. at 691 (upholding preventative, dangerousness-based detention "only when limited to specially dangerous individuals and subject to strong procedural protections"); *Black*, 103 F.4th at 151 (questioning criminal adjudication-adjacent deprivation under § 1226(c) absent "new or unpunished conduct"); (Bond Hr'g Tr., Dkt. 42, at 67:4–12 (conceding that any future danger posed by L.G.M. is "speculative")).

### III. Risk of Flight

The Court next considers the risk of flight posed by L.G.M., which it finds to be minimal. In support of their argument that L.G.M. presents a risk of flight, Government Respondents point to (1) L.G.M.'s March 2018 removal order, decided *in absentia* because L.G.M. failed to appear at his initial removal hearing on March 14, 2018, (Gov't Bond Ex. 2, Dkt. 38-2, at 1); and (2) the possibility that L.G.M. will be deported if his deferred removal status is revoked, (*see* Bond Hr'g Tr., Dkt. 42, at 64:2–65:21). Neither fact, either separately or in combination, amounts to clear and convincing evidence that L.G.M. poses a risk of flight.

Regarding L.G.M.'s failure to appear in connection with his removal proceedings, L.G.M.'s counsel explained at the Bond Hearing that this failure was due to an error that was rectified within what appears to be 30 days. (*Id.* at 55:3–19.) Given this explanation, together with the facts that L.G.M. later appeared as directed at his removal proceeding and that the IJ ultimately vacated the March 2018 removal order, the Court finds that this one-time lapse nearly a

17

decade ago has no bearing on whether L.G.M. will reappear as directed in his removal proceedings. (*Id.* at 17:19–19:12.)

Regarding the argument that L.G.M. will flee if he thinks he will be deported, this is speculation that is rebutted by L.G.M.'s personal circumstances. L.G.M. submits three letters from family members in Long Island demonstrating that L.G.M. has a loving family who is eager for him to return home. (*See* Dkt. 39-1 (notarized affirmations from L.G.M.'s sister, mother, and stepfather).) L.G.M. also appears to have held down a job working with his stepfather in construction prior to his incarceration, which, as discussed, should be available to L.G.M. upon his release. (*See id.*) Furthermore, there is no evidence that L.G.M. has anywhere to go if he leaves his family in Long Island or has any means to flee the area. The only other family L.G.M. has is in El Salvador, the very place to which he is trying to avoid being deported. Indeed, L.G.M.'s entire legal fight is aimed at returning him to, and keeping him at, his family home in Long Island.

Thus, the Court finds that Government Respondents have failed to demonstrate by clear and convincing evidence that L.G.M. poses a risk of flight if released from ICE detention. The Court further finds that any risk of flight would be mitigated by the same bond conditions discussed above that would ameliorate any risk of danger to the community posed by L.G.M. Accordingly, the Court invites the parties to propose measures that would decrease the risk of flight, such as regular reporting to the government agency identified by Government Respondents as the primary point of contact for L.G.M.'s release.

## CONCLUSION

Accordingly, the Court grants L.G.M. release on bond, subject to the conditions to be set after the Court has heard from the parties. The parties shall file their submissions regarding bond conditions within two (2) weeks of this Memorandum & Order. The parties' submissions may include a proposed bond order. The Court will thereafter either (1) convene a conference with the

18

parties to discuss the proposed bond conditions, or if the Court finds such a conference unnecessary, (2) issue an order releasing L.G.M. on bond with conditions.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: July 31, 2025
      Brooklyn, New York